### Hudson County Court of Common Pleas.

ALEX RIVERS, PETITIONER-APPELLANT, v. AMERICAN RADIATOR & STANDARD SANITARY CORPORATION, DEFENDANT-APPELLEE.

JANIE RIVERS, ADMINISTRATRIX, ETC., OF ALEX RIVERS, DECEASED, PETITIONER-APPELLEE, v. EAST COAST SHIPYARDS, INC., DEFENDANT-APPELLANT.

Decided July 26, 1946.

For the petitioners, *Joseph A. Lipman* (*Aaron Gordon*, of counsel).

For the defendant American Radiator & Standard Sanitary Corporation, *Cox & Walburg*.

For the defendant East Coast Shipyards, Inc., *James J. Skeffington*.

DREWEN, C. P. J. In the Bureau the two cases entitled as above were, for convenience and by consent of counsel, tried together. Each, however, presents a separate and independent issue and so they were dealt with upon the hearing.

The petitioner Alex Rivers, now deceased, filed his claim petition against American Radiator & Standard Sanitary Corporation under date of April 20th, 1944. The petition states the nature of the claimed accident and injury as follows: "Injured heart and heart muscles as a result of nature of work being performed on that day," that is, on October 16th, 1943.

While the latter petition was pending and on May 8th, 1944, Rivers, who had been out of his former employment for several months, went to work for East Coast Shipyards, Inc., as a painter, and three days later met his death while so engaged. Claim petition was filed against the latter company by his widow and administratrix Janie Rivers. The accident and injury are alleged as follows: "While scraping rust from the side or hull of a ship on the way, decedent col-

lapsed." He "died immediately." The date of death was May 11th, 1944.

The facts relevant to the claim of Rivers against the Radiator Corporation are these: He entered the employ of that company on November 27th, 1922; it was terminated on October 26th, 1943. Throughout that entire period he was continued at the same work. He drove a gas-powered truck between a metal pile in the plant yard and the cupola building where the metal was melted down. The distance between these two points of operation was short. The workman's function was exclusively that of truck-driver. He had no part either in the loading or unloading of his truck. It was loaded by crane operation and unloaded at the furnace by a crew of men stationed there for the purpose. As one witness described it, the workman went "from inside to outside." There is a statement in the testimony that during a working day the workman trucked forty charges to the furnace, making eighty separate trips in all. The record does not indicate that during his entire twenty years of employment petitioner lost any time by reason of illness or injury, save only that in 1941 he was out from May 24th to June 9th with grippe. The last day he worked was October 26th, 1943, when he was on a night shift. At 6:16 A. M. he "punched out" saying that he was "not feeling well" and that "he did not feel like working." As his widow describes it: "He got sick with a cold and we had the doctors to come in." Under a company rule, after three days' absence from work because of illness, an employee was required to submit to a re-employment examination by the company physician. Pursuant thereto Rivers was examined by Dr. McCarron on November 29th, 1943. This examination showed "myocarditis after pneumonia," and the doctor advised that Rivers should not return to work. Dr. McCarron made two subsequent examinations, one on January 6th, 1944, and the other February 25th, 1944. The result of the January examination as shown by the doctor's records was "marked cardiac disease—should not return to work;" and the record of the third and last examination is "auricular fibrillation following pneumonia—should be discharged from further employment; not able to return to work."

It will be noted that the claim petition against the Radiator Company was not filed until two months after the last of the three re-employment examinations.

By way of preparing for trial of this claim an examination of Rivers was also made by Dr. Visconti on January 5th, 1944, with a finding of "serious cardiac condition; disturbance in the rate, rhythm and quality of heart sounds." Dr. Visconti estimated that disability was total.

An award was sought to cover the disability from the termination of employment on October 26th, 1943, until May 11th, 1944, the date of death. ·

The proofs show no causal relation whatever between anything in the work or working conditions of the claimant and the disability proved. We are left entirely to speculation. Effort was made to prove an important disparity in temperature between the place where the workman loaded his truck outdoors and where he discharged it indoors. The month was October. But nothing that is said in this connection is either definite or persuasive. As one witness gave it: "Inside was warm. Inside was hot. Outside is different again *in the winter.*" And again: "It was warmer inside where the truck stops to let the cupola be filled with iron than outside where the metal is picked up by the truck." Another witness described how the workers within the smelter building were "thinly" clad, adding "all day long they dress very thinly because they are not going in and out of the building. The men that go to and from there, they have to be prepared, * * *. That was so even in winter time." But all this is unsatisfactorily vague and unrelated to relevant days and times; it does not withstand the positive and unequivocal testimony adduced by the employer on the subject. By this it was shown that the temperature in the cupola building was approximately the same always as the outdoor temperature; and that there was no radiation of heat from the cupola into the room is demonstrated by the testimony of the witness Cathcart that he could put his "hand on the side of the shell of the cupola at any time, at any place" while the cupola was in capacity use. This was not contradicted.

But there are considerations yet more potent that weigh

against the claim. Implicit in the proofs are the developing phases of the workman's illness: cold, pneumonia, with resultant heart disease. The injury and ground of award as alleged in the claim petition is "injured heart and heart muscles as a result of nature of work being performed on that day," *i. e.*, October 16th, 1943. From the cold contracted on the date named, to the disability alleged, the court is left to find its way by nothing better than unaided conjecture. The primary difficulty is the want of proved relation between the cold and any incident or condition of the work. For if there was a causal sequence that would relate the work to the ultimate disabling injury, no one has said so. There is simply no proof, medical or otherwise, upon which such a conclusion can be based. No accident or happening outside of the routine and the usual is so much as suggested. After working at the same task for some twenty years petitioner on the date alleged "didn't feel well; he didn't feel like working." And he "punched out" of the plant to go home. And that is all there is. There is indicated no more reason why petitioner's illness should have been induced by an event occurring or condition prevailing on or about the day in question than at any other time during the whole twenty year period of his employment. After examination and study of the record we are left as free to say that the disabling illness had an origin entirely apart from the employment as we are to conjecture otherwise. The burden is upon the petitioner to establish his case by a preponderance of the proof. That he has failed to do.

Petitioner cites to us the case of *Richler* v. *E. I. DuPont DeNemours & Co.*, 118 *N. J. L.* 404; 193 *Atl. Rep.* 194; 119 *N. J. L.* 427; 197 *Atl. Rep.* 276. That case has no application to the facts here. Its one effect is to accent the deficiencies of the present record. There exposure to cold and dampness was specifically shown to have occurred at a definite time, and in a fully described place and conditioning; this being supplemented by unequivocal medical testimony that the given exposure was the inducing cause of the illness. Not one of these elements is established *sub judice*.

The Deputy Commissioner dismissed the claim petition in the Bureau and that decision is affirmed.

This brings us to the claim of Janie Rivers as administratrix of Alex Rivers against the East Coast Shipyards, Inc. There can be no question that when Alex Rivers entered the employ of the East Coast Shipyards on May 8th, 1944, he was suffering from a grievously advanced disease of the heart. This had been shown by the findings of three physicians, Drs. McCarron, Shapiro and Visconti. Upon the hearing it became a postulate in the case. The Shipyard Company required no pre-employment examination and Rivers was put to work on a scaffold, scraping rust from the outer hull of a vessel, with a wire brush. After three and one-half days of this work he collapsed on the scaffold and died very soon thereafter. The nature of the work was described by a fellow employee, the witness Casanova, who testified: "We scraping the ship up and down (witness indicates with an upward and downward motion of his hand and arm)," using a wire brush weighing about three-quarters of a pound. "It's hard work—the wrist tire all the time. * * * He (Rivers) stop to take a rest * * * he breathe tired. (The witness opens his mouth and takes a deep breath.) * * * We scrape up and down with the hand (witness clenches his right hand and makes motion from left to right and up and down from above his head and then bends down to between the ankle and the right knee.)" On May 8th, his first day of employment, decedent worked from 11 A. M. to 6 or 7 P. M. On May 9th and 10th he worked ten hours each day. On the 11th he worked from about 7:30 A. M. until his collapse at or about noon. The same witness said that he and Rivers "worked standing up—up and down * * *. Sat down part of the time. * * * We work about one hour straight and take five minute rest." Later the witness said: "We can't sit down. Work down. We would sit down sometimes. * * * Stand for high and sit for low."

The circumstances immediately preceding the workman's collapse and those attending his discovery in that state on the scaffold are given in the record as follows: The co-worker Casanova left the scaffold, he said, at 11 A. M. to go to the first aid station for attention to his eye. He returned at about 11:55 A. M. and saw decedent still working, calling out

to him that it was time to eat. Decedent responded by holding up five fingers, taken to mean that he still had five minutes of work to do. Casanova then went to the restaurant alone and while there learned of decedent's death. The first one to see decedent prostrate on the scaffold was the witness Paterson. He fixes the time at 11:45 A. M. and says: "I happened to look up and here was a fellow hanging down from the scaffold head toward the ground. His knees was up against the shell of the boat * * * We brought him up on deck and laid him on the deck. * * * I loosened up his shirt and tried to get as much air as possible to cool him off * * *. He was lying on the deck about one-half minute, then the man just opened his mouth and gave a sigh, and that was the last. * * * His legs was inside here between the shell and the scaffold. Then his body and his head was hanging right down here with his arms like that, hanging down head toward the ground. * * * He had a steel scraper and wire brush. They were lying beside him on the scaffold. * * * He was bluish in the face, his lips were bluish * * *. His back was lying on the scaffold and the rest of his body was hanging down." The witness saw no sign of injury. Immediately in front of the scaffold at the place where the body had been found the ship's hull bore scraping marks.

The witness Casanova was confronted with a statement that had been made by him to a company representative soon after decedent's death, in which the witness is shown to have stated "he (decedent) didn't work hard but took it easy while he was working with me."

A death certificate issued by the acting county physician of Hudson County gave the cause of death as coronary occlusion. Petitioner's medical expert, Dr. Kaufman, in response to the hypothetical question stated his opinion of the cause of death as follows: "Mr. Rivers died from an acute cardiac attack, which resulted from the scraping of the rust, the work which he did just preceding his death; and that this was brought about because he himself went to work as a cardiac, with an irregular heart known as auricular fibrillation; * * * that the work he did on that particular morning just preced-

ing his death was greater than the cardiac reserve which he had left; and that he died as a result of this particular strain and effort on his heart." Concerning the cause of death (coronary occlusion) as given in the death certificate, Dr. Kaufman testified further: "Whether it was acute coronary occlusion or not, we would not know without an autopsy, but certainly in a man with a fibrillating heart it is not necessary to have occlusion to die from heart failure—with or without an occlusion." On cross-examination the doctor stated that to one suffering from a fibrillating heart, as decedent had been, acute cardiac failure "may come at any time, under many conditions; * * * it could occur without any unusual strain or effort. It could occur while he was eating a meal; it could occur while he was in bed; it could occur while he was walking up a flight of stairs in his own home, or from any other failure. * * * I would not say it would not come about from effort. Whether it be physical or emotional it would be effort, but the effort need not be industrial."

The only other witness in the case testifying on the *post mortem* problem was Dr. Abraham E. Jaffin, called by respondent. Dr. Jaffin's answer to the hypothetical question was to the effect that he could ascribe no relation between decedent's work and death for the reason that to do so would in his opinion be mere speculation. The doctor's language is: "It is my opinion that regardless of this man's prior cardiac condition, as to whether he had a cardiac condition or not, but based entirely on the following facts, namely, that this man performed the same effort each day for several days, three or three and one-half; that there was no evidence that he did so under a long sustained effort, because he took it easy— I was told he took it easy and rested for a few minutes every hour. I assume from that that he did what he could. Therefore, I feel that I cannot honestly say that his work was a causal factor in his sudden death, because it would be too conjectural to do so under oath, as witness, sudden death occurs more frequently even without effort." The doctor on cross-examination did say, however, that the disease from which decedent was shown to have been suffering lessens the functional capacity of the heart "if it lasts long enough. * * * If it

lasts, for instance, for days it may so tire the heart that the heart will fail." And he added that whether fibrillation results in interference with the function of the heart "depends upon the rate, the number of beats per minute, that result in the ventricle; * * * and the man's ventricle can carry on effectively unless the rate is so fast that ultimately he has muscle fatigue of his heart and he goes into a faint from fatigue or over-exertion of his ventricle." The qualifications thus made by the witness relating to the duration of the evil and the rate and number of beats resulting in the ventricle can, for the want of specific proof, be related to no relevant standard and so must remain academic. Suffice it to say that from first to last, respondent's expert declined to assert an affirmative hypothesis upon the relation of the work to the death, because of the speculative nature of the inquiry. That of petitioner's Dr. Kaufman remains therefore the only such hypothesis in the proofs.

It is our judgment that petitioner fully discharged the burden of proving that her decedent met his death as the result of an accident arising out of and in the course of his employment.

The main contention of respondent is that there was *no accident;* that without accident it cannot be said in the statutory sense that there is injury or death arising out of and in the course of the employment; in a word, that "accident" is the basic thing. We must suppose that this argument rests on the assumption that the term "accident" means the impingement upon the person of the worker of some force external to him and originating in mishap or exigent phenomenon. There was no such happening. We are persuaded, however, by a study of the cases that respondent's assumed meaning of the term is now an anachronism. The expanding of the sense of "accident" has been a persistent process in the decisions of this and other jurisdictions and the present phase of the development renders obsolete, in our opinion, any theory that would exclude the death *sub judice* from that category.

Speaking of the case before the Supreme Court in *Molnar* v. *American Smelting and Refining Co., infra,* the present Chief Justice said: "As for an accident in the sense used in

the earlier days, there was none; but it appears to be the effect of our more recent decisions that where the performance of manual labor entails a strain upon the heart without which death would not have occurred but in consequence of which, combined with causes disassociated with the employment, death does occur, the experience constitutes an accident within the meaning of the Employer's Liability Act [*N. J. S. A.* 34:15–1, *et seq.*] and that when the contributory strain arises out of and in the course of the employment, the accident likewise so arises." True, there is an array of cases in which our appellate courts take occasion to point out a factor of proof *in some extraordinary circumstance attending the degree or kind of effort expended by the workman,* but the fact is that in many, if not in all these instances, the finding of such a factor was needless in view of the then prevailing doctrine established by our highest court. We shall trace briefly the detail of what thus we indicate. In *Ciecwirz* v. *Public Service,* 128 *N. J. L.* 16; 24 *Atl. Rep.* (2d) 394, 396, the Supreme Court speaks of the "laborious and strenuous work of shoveling up soil." In *Schneider* v. *F. & S. Haerter* (*Supreme Court*), 119 *N. J. L.* 548; 197 *Atl. Rep.* 281, we read: "The heavy work decedent was doing most of the day * * *, the more or less extreme exertion." In *Rother* v. *Merchants Refrigerating Co.* (*Supreme Court*), 122 *N. J. L.* 347; 6 *Atl. Rep.* (2d) 404, reference is made to "unusual effort" as inducing "unusual exertion." And the same court in denying compensation in *Wehrle* v. *Sherwin-Williams Co.,* 133 *N. J. L.* 347; 44 *Atl. Rep.* (2d) 389, takes occasion to observe that there was "no evidence of any great exertion." In *Passafiume* v. *H. T. Hynds, Inc.,* 128 *N. J. L.* 27; 24 *Atl. Rep.* (2d) 394, the Supreme Court relates the death of petitioner's decedent to "the extra heavy exertion occasioned by decedent's work." See, also, the preoccupation of the court with special factors of exertion and stress in *Bernstein Furniture Co.* v. *Kelly,* 114 *N. J. L.* 500; 177 *Atl. Rep.* 554; 115 *N. J. L.* 500; 180 *Atl. Rep.* 832.

Though in our opinion the degree of exertion required by decedent's employment in the instant case is sufficient to bring it within the indicated doctrine of the decisions last

cited, the principle upon which our decision shall rest is ulti-
mately established for us by judicial authority rendering it
clear beyond question that no more is required, where the
workman is afflicted, as here, with a predisposing cardiac weak-
ness, than that the death or injury be shown to bear causal
relation to the routine activities of the workman as normally
pursued.

In *Molnar* v. *American Smelting and Refining Co.*, 127
*N. J. L.* 118; 21 *Atl. Rep.* (*2d*) 213, the Supreme Court held
that the degree of exertion is of no consequence so long as
performance of the required work caused a strain of the heart.
In the same opinion the present Chief Justice compiles state-
ments of principle in this regard as then having the approval
of our Court of Errors and Appeals. So important is this
in the present connection that we quote the reference at length
(127 *N. J. L.* 120; 21 *Atl. Rep.* (*2d*) 214) : "I do not think
we should attach any importance to the fact that there was
no strain or exertion out of the ordinary. * * * Nor do
I think we should attach any importance to the fact that this
man's health was as described. * * * An accident arises
out of the employment when the required exertion producing
the accident is too great for the man undertaking the work,
whatever the degree of exertion or the condition of health.
* * * The real question, as it seems to me, is this: Did
it (this death) arise out of his employment? On this regard
the evidence before the county court judge was undoubtedly
conflicting. But he has held that it did, and I think there
was sufficient evidence to support that finding. The death,
says the learned judge, was caused by a strain arising out
of the ordinary work of the deceased operating upon a con-
dition of body which was such as to render the strain fatal.
The fact that the man's condition predisposed him to such
an accident seems to me to be immaterial. The work was
ordinary work; but it was too heavy for him. * * * When
the learned county court judge has held that the result of the
work was the failure of the blood supply resulting in angina
pectoris, and that it was because he was engaged in doing his
ordinary work under this diseased condition that this failure
arose, and that the work and the disease together contributed

to the death, it would be impossible to deny that that is within the actual meaning of the words in the case I have quoted." And 127 *N. J. L.* (at *p.* 121); 21 *Atl. Rep.* (*2d*) 215: "We are satisfied that but for the employment the death would not have occurred when it did. That, under the statement of principle quoted above, constitutes a statutory accident. The accident, then, consisted of the putting forth of the man's physical effort exerted in the normal performance of his usual duties and the fatal effect thereof upon a vital organ already seriously impaired by disease. The effort would not have been undue if the man had been in health but it was excessive for the weakened member. The application of the law to the facts results in a finding that there was an accidental strain of the heart."

In *Hentz* v. *Janssen Dairy Corp.*, 122 *N. J. L.* 494; 6 *Atl. Rep.* (*2d*) 409, the Court of Errors and Appeals reversed the Supreme Court's denial of relief to decedent's administratrix (121 *N. J. L.* 160; 1 *Atl. Rep.* (*2d*) 751), and in its opinion reviews the facts and holdings of the English decisions from which were taken the principles compiled by Mr. Justice Case in the Molnar opinion, *supra.* Speaking for the Court of Errors and Appeals, Mr. Justice Bodine says (121 *N. J. L.* (at *p.* 495); 6 *Atl. Rep.* (*2d*) 409): "The Supreme Court erroneously considered the circumstance that the heart had been weakened by the strain of work over a long period of time as excluding recovery, but this is a circumstance which under our cases and those decided in England, could make no difference where the accident arose out of and in the course of the employment."

A similar reversal is that of *Ciocca* v. *National Sugar Refining Co.*, 124 *N. J. L.* 329; 12 *Atl. Rep.* (*2d*) 130. There death was caused by heat prostration. Decedent had been employed as a sweeper. His collapse occurred on a torrid day. He was not exposed to the direct rays of the sun and it seems to have been conceded that where he worked the temperature was a few degrees cooler than that prevailing outdoors, and also that his work required no undue or unusual effort. In the opinion of the Court of Errors and Appeals reversing the Supreme Court it is written (124 *N. J. L.* (at *p.* 334); 12

*Atl. Rep.* (*2d*) 132): "We need hardly labor the point that simply because an employee does not in his employment exercise out of the ordinary effort, strain or exertion, or is not subjected to greater exposure than that to which other persons generally in that locality are exposed, it does not necessarily follow that the employee cannot otherwise sustain a compensable accident."

This discussion would not be complete without reference to the array of liberalizing authority collected and approved by our Court of Errors and Appeals in *Bollinger* v. *Wagaraw Building Supply Co.,* 122 *N. J. L.* 512 (at *pp.* 519, *et seq.*); 6 *Atl. Rep.* (*2d*) 396.. There Chief Justice Brogan, speaking for the court, brings the proposition to its ultimate simplicity and broadest inclusion by formulating the test that the injury or death must be regarded as resulting from accident "if but for the employment it would not have occurred" (122 *N. J. L.* (at *p.* 520); 6 *Atl. Rep.* (*2d*) 401).

A case that exemplifies a very recent application of the principles in question is *Roma* v. *Associated Transport, Inc.* (*Supreme Court,* decided May 21st, 1946), 134 *N. J. L.* 279; 47 *Atl. Rep.* (*2d*) 337. There it was admitted that the accident occurred in the course of the employment, but the contention was that it did not arise out of the employment. Using the word "accident" in a non-technical sense and as connoting no more than the event of death, the same language might serve as a statement of the position taken by the present respondent.

The test of compensability is stated in *Lohndorf* v. *Peper Bros. Paint Co., infra,* as follows: "To render an injury compensable there must be an event or happening, beyond the mere employment itself, which brings about the final result or contributes thereto. * * *." We are mindful of the words "beyond the mere employment itself." No supporting authorities are given; and the qualification noted will, in any event, have to be rejected as in complete dissent from the ruling decisions. (Cases *supra.*)

Before leaving this question of "accident" we think the purposes of clarity would be served were we to accent the points of distinction which in our judgment prevent appli-

cation to the argument before us of the decisions upon which respondent relies. In *Armstrong* v. *Union County Trust Co.,* 14 *N. J. Mis. R.* 648; 186 *Atl. Rep.* 522; *affirmed,* 117 *N. J. L.* 423; 189 *Atl. Rep.* 138, there was no proof of any fact or circumstance attending the death, that is no proof of anything in the employment that could have contributed to or induced the fatal event. In a word, there was nothing from which an inference could be drawn. The same must be said or *Nardone* v. *Public Service,* 113 *N. J. L.* 540; 174 *Atl. Rep.* 745. There the theory of petitioner's case was that decedent came to his death by being struck on the head by a falling brick. The counter-proof "completely exploded" this theory and there was no other left. The court observed that there was "an utter failure to sustain the theory upon which the case was tried."

There are indeed cases in which death is inferred, as we infer it in the present instance, from the attendant circumstances established in the proof, and many of these are cited in the Nardone opinion, but for contrast. A careful reading of *Azarowicz* v. *Metropolitan Beef Co.* (*Supreme Court*), 118 *N. J. L.* 89; 191 *Atl. Rep.* 483, shows that the case does not have the effect for which respondent cites it. True, the asserted principle was laid down, but a study of the facts in the case, with the resultant award for aggravation of heart disease, does not fit it to respondent's purpose at all. In *Schlegel* v. *Baron* (*Supreme Court*), 130 *N. J. L.* 611; 34 *Atl. Rep.* (*2d*) 132, it was a question of credibility upon which the decision turned. Compensation was denied solely for the reason that there was falsification in the very claim that an accident occurred. It is equally clear that had the court believed the story of the occurrence there would have been an award of compensation. Also in *Grabol* v. *Borstein Electric Co.* (*Supreme Court*), 23 *N. J. Mis. R.* 225; 41 *Atl. Rep.* (*2d*) 521, there was no proof of a single fact from which a contributing cause of petitioner's death could have been inferred. In *Wehrle* v. *Sherwin-Williams Co.* (*Supreme Court*), 133 *N. J. L.* 347; 44 *Atl. Rep.* (*2d*) 389, there was a like failure of proof. "The only proof of exertion" says the court "before the death was walking to the testing room and it (death)

occurred before any test was made." In a word, it was not shown that the death occurred in the course of the employment. *Bouvier* v. *County Gas Co.* (*Supreme Court*), 134 *N. J. L.* 89; 45 *Atl. Rep.* (*2d*) 894, is another case of the incredibility of the proof adduced to establish the one and only theory upon which petitioner's case was tried. The court said: "It must be remembered that such probability (that injury was caused by the employment) was predicated upon a hypothesis which included the fact that petitioner had been struck on the left side * * *. This, we find, did not occur." Since there was a failure of the only hypothesis tendered, the court had no other upon which to base an affirmative conclusion.

A case upon which respondent seemingly lays special stress is *Lohndorf* v. *Peper Bros. Paint Co.* (*Supreme Court*), 46 *Atl. Rep.* (*2d*) 439. It is our judgment that distinction between this and the New Jersey cases which rule the subject is perfectly clear. In the Lohndorf case decedent had suffered a number of heart attacks prior to the alleged "accident," with no claim or pretense at any time that these bore a relation to his employment. On August 23d, 1944, the date on which the "accident" occurred, decedent had an attack "whil⌐ standing by a counter doing nothing and following no unusual exertion. Another attack was experienced by him later that afternoon and again on the following day." On August 25th, two days after the "accident" alleged in the claim petition, he suffered another attack after moving some cans of paint from a low hand-truck to the floor; and from the opinion we read that "on the following day (the 26th) he had another attack concerning which there is no evidence of anything unusual occurring or of any particular exertion, except that it was a busy day and he had been waiting on customers." There was a conflict in the testimony given by the medical experts. Those appearing for petitioner found a contributing cause of death in decedent's failure to give up his employment, mentioning no particular incident thereof as requiring cessation. One of petitioner's medical witnesses did say, however, that in his opinion the work done by decedent on and after August 23d was the contributing cause of death, but, as the court

comments, deceased had been doing similar work for a year and a half. It is important to observe that in this conflict of medical testimony the Supreme Court found that adduced by the employer to be "weightier and more persuasive." In the instant case, there is no medical testimony to countervail that of Dr. Kaufman to the effect that the exertion of decedent's work was a competent inducing factor. But apart from all this, the opinion in the Lohndorf case by no means supports the argument of respondent here, but shows clearly that the Supreme Court in making its Lohndorf decision had no intent but to be in full accord with the authorities *supra* upon which the present opinion rests. "We do not perceive," says the court, "under the circumstances that the cases of *Hentz* v. *Janssen Dairy Corp.,* 122 *N. J. L.* 494; 6 *Atl. Rep.* (*2d*) 409, and *Molnar* v. *American Smelting and Refining Co.,* 127 *N. J. L.* 118; 21 *Atl. Rep.* (*2d*) 213, are controlling. In these cases it was found that the deceased suffered a strain of the heart *from unusually hard labor* on the day in question, and that the employee collapsed shortly after his *severe efforts.*"

If the phrases "unusually hard labor on the day in question" and "severe effort," appearing in the last sentence of the Lohndorf excerpt above, are to be taken as intending a qualification of the cases to which they refer in such a way as to describe thereby a *sine qua non* of recovery, then we are bound to observe that the Lohndorf decision is therein at variance with the higher court's conclusions indubitably established by the decisions *supra.*

Whether or not the judicial extension of the law of industrial accident can be said to revolutionize, as counsel urges it does, the status and responsibility of the employer into those of an outright insurer of the workman's life, is certainly not a matter with which the authority of' this court can properly be concerned in resolving the present controversy.

There is another challenge in respondent's argument, and which can, for the clarity of its discussion, be concretely stated thus: Even though the workman's normal task would as matter of law be sufficient under the circumstances to supply an inducing cause of death and so to render the death an acci-

dent, there is nevertheless no proof that the work *was* the inducing cause, more especially in view of the medical testimony that his state of illness was so extreme that it could have resulted in death following the slightest effort or with practically no effort at all.

We have already remarked that upon the trial decedent's grave cardiac illness was a postulate. That it was so is not at all obscured by the labored sciolism of counsel's cross-examination of the doctors, more especially of Dr. Jaffin. The opinion of Dr. Kaufman on behalf of petitioner had, as we have seen from his testimony already quoted, made decedent's life tenure precarious indeed. This opinion was elicited, not by counsel for petitioner but by counsel for respondent, who in cross-examining Dr. Kaufman sought not only to give emphasis to that opinion but to carry decedent's pathological uncertainty of life to the farthest possible extreme. Respondent's counsel sees defensive strength in this and in his brief characterizes the result of the cross-examination as "most enlightening." It happens to be our judgment that in plain truth no medical problem, in a practical sense, remains. With the medical proofs conditioned as shown, and uncontradicted, the argument on the cause of death as it arises from the nature of petitioner's work, the surrounding circumstances, his collapse and demise, is an argument grounded in the law of evidence, as it seems to us, without practical relation to any problem of medicine. It having once been placed beyond controversy that the nature of the workman's heart illness was such that he could have died in his sleep, that industrial exertion would more than suffice, there can no longer be a real need for an expert to tell us that in all likelihood he died from the effort expended in his work.

Undoubtedly it was and is the theory of counsel that in dealing with these probabilities, where a sufficient increase of the internal hazard is shown, the external hazard will thereby be rendered no longer potent. In one respect at least we are clear of probabilities and stand in the light of certainty: decedent did not die in his sleep nor in any other of the easier circumstances hypothesized by the doctor; he died while at his work.

As it appears to us, the fallacy in the theory noted lies in the failure to see that when to the fact of internal weakness is added the external effort, we are not displacing one hazard by another, but are adding rather hazard to hazard. There is no occultation of peril but an increase of peril totally. With this increase of peril there runs a corresponding increase in the grounds of probability, these centering in the hazard that is added, so that when this maximum of hazard is climaxed in death, the probability that the immediate cause of death is to be found in that by which the maximum was created, is a cogency that the illative sense does not and cannot resist. In the inference the proofs allow, decedent was to the work at which he died as an unseaworthy ship to the storm in which it sinks. It can be readily admitted, moreover, that this reasoning of the law of evidence is entirely consistent with the possibility that decedent actually died of internal causes, uninfluenced by his work. There is no requirement that such possibility be excluded in order that effect be given to the inherent probability of the circumstances proved. The latter does not collide with the former, it transcends it. Our acceptance of respondent's view of the proofs in the respect considered would require us to exclude completely from the case the principles of circumstantial evidence.

For authority we cite the dissertations on the law of probability and fair inference embodied in *Belyus* v. *Wilkinson, Gaddis & Co.,* 115 *N. J. L.* 43 (at *p.* 47) ; 178 *Atl. Rep.* 181; *Jackson* v. *Delaware, Lackawanna and Western Railroad,* 111 *N. J. L.* 488 (at *p.* 490) ; 170 *Atl. Rep.* 22; *Austin* v. *Pennsylvania Railroad,* 82 *N. J. L.* 416; 81 *Atl. Rep.* 739. See, also, the many instances of cause of death as determined by inference in the cases described and cited in *Nardone* v. *Public Service, supra.*

Exception was taken upon the hearing to the admission into evidence of the certificate of death as made by the acting county physician, but throughout the argument the point has remained unmentioned. We regard the question as of no importance. The certificate states the cause of death as coronary occlusion. Dr. Kaufman gives it as acute cardiac failure, adding that without an autopsy it cannot be told whether

or not there was an occlusion. In any event and as already observed, the medical proofs are in such posture as to make it of no moment whether decedent died of the one heart illness or the other. It follows that the validity of the award is not affected by the admission of the death certificate.

For the reasons hereinabove set forth the Bureau's determination of fact and rule for judgment in favor of Janie Rivers, administratrix of Alex Rivers and against East Coast Shipyards, Inc., are in all things affirmed, save only with respect to the computation of $6,000 as the amount of award to petitioner. On the oral argument counsel for respondent took exception to the amount stated as being the result of a miscalculation. Since the question is raised, and the matter before this court being in the nature of a trial *de novo*, it becomes our duty to deal with it. When challenged in the course of the oral argument with the incorrectness of the amount, counsel for petitioner relied on what he then spoke of as a stipulation entered into upon the trial. An examination of the record does not sustain the notion that there was a stipulation. We give the details. At the conclusion of the first testimony of the administratrix, counsel for petitioner requested to be informed whether respondent denied that at the time of decedent's death he was earning $1.10 per hour. This was followed by a "discussion off the record." At its conclusion petitioner's counsel dictated into the record the following: "It is stipulated that the decedent at the time of his death * * * was earning $1.10 per hour and that he worked six days a week, subject to counsel's advising me otherwise. If it is otherwise, I will be given an opportunity to see the record." The court then asked: "How many hours a week?" to which petitioner's counsel replied: "Forty-eight hours a week, a minimum of forty-eight hours." To all of this counsel for respondent maintained the silence that ordinarily would give consent. Were there no more than the foregoing, the making of an effective stipulation could hardly be denied. Taking respondent's silence together with the "discussion off the record," it would be but fair to presume that the terms had been discussed and agreed upon and then stated in the record. But there the matter does not end.

Sometime later the administratrix was recalled as a witness and upon concluding her direct-examination counsel for petitioner reopened the subject of decedent's weekly wage. The discussion runs through three pages of typescript (117 to 119, inclusive). Such doubts were raised and things said as to leave nothing of the earlier apparent stipulation, and it was the Deputy Commissioner who finally resolved the dispute as follows: "The wage question is to be ascertained by Mr. Skeffington in the records of the respondent." This time it was petitioner's counsel who remained silent. And there the matter remained. There is nothing in the transcript to show that the records of respondent were thereafter consulted to ascertain decedent's weekly wage or the hours and rates by which the same could be computed. Therefore, unless there can be effective agreement now the case will have to be remanded to the Bureau for the proofs in the particular indicated. Let counsel be governed accordingly in the drawing of the determination of facts and rule for judgment in this court.

There is allowed to counsel for Janie Rivers, administratrix, as petitioner-appellee for services on this appeal the sum of $400, to be paid by respondent-appellant, East Coast Shipyards, Inc.